The first case we're going to hear today is Sapp v. Industrial Action Services LLC, number 22-2181. Counsel? Oh, actually, are you going to reserve any time? Yes, I'd like to reserve three minutes for rebuttal, please. That'll be granted. Thank you. And you can proceed when you're ready. May it please the Court, my name is Maureen Farrell, and I represent the appellants Kevin Sapp and Jamie Hopper. Arbitration agreements are as enforceable as any other agreement, but not more so. The legitimacy of an arbitration is founded, it begins, and ends with the agreement of the parties. Here, the appellants, Kevin Sapp and Jamie Hopper, did not get what they bargained for. The first question before you, Your Honors, is whether or not there was an arbitration agreement at all. That is the first point of error that we raise. We don't see the word arbitration or expert determination in the agreement, right? I believe that's correct. Neither arbitration nor expert appear anywhere in their punitive, either arbitration or expert determination clause. The primary case would seem to be in Delaware, the Kuhn case, K-U-H-N, from 2010. Yet, I don't see that cited in any of the briefs. Now, it's mentioned in the Bus Air case that you cite. But wouldn't Kuhn be the biggest? This is governed by federal law, right? It is, yes. And isn't the primary case in Delaware the en banc decision of the Delaware Supreme Court? Your Honor, neither party referred to those in their briefs. But shouldn't they have? Perhaps. I wish we had now. I think that we relied on the cases that were relied upon by the magistrate when he had his recommendation and also by the district court when he declined to follow the recommendation of the magistrate and determined that the clause was an arbitration clause. Is it an expert determination clause? The appellants think that it is an expert determination clause. Certainly, there is a dispute resolution procedure that refers what we would say is a limited, narrow issue of fact, calculation of an earn-out statement, and that that was reserved for the accounting firm. That's a defined term. But nothing more than that? Correct, nothing more than that. But specifically, in the context of the earn-out consideration clause and the relevant asset purchase agreement, following the expert determination clause or the arbitration clause, are additional provisions that we call the non-circumvention provisions regarding earn-out consideration. Those are after the dispute resolution clause, and they concern much broader protections that the appellants argued for. They negotiated specifically for those that required good faith and fair dealing and to avoid any attempt to circumvent the payout of the earn-out consideration. And so when the district court says that the dispute resolution clause includes those, now it's included much broader questions of law that we would say were not intended to be included in the dispute resolution clause. So it goes to trial, or is it? No, those issues would go to trial. So definitely the accounting firm would be competent to determine the earn-out statement, which I think the language in the clause suggests that's computational. And then once you have the earn-out statement, the statement itself is final and binding. But the question about non-circumvention or whether there was a violation of good faith and fair dealing, those are questions that are properly reserved to the courts in an adversarial process. It's a little confusing. It doesn't say either arbitration or expert determination. However, with respect to the accounting firm's determination, the agreement says that the District of Delaware can enter a judgment then, which makes it seem kind of like an arbitration clause. My question to you is, actually, does the U.S. District Court have power to confirm the determination of an expert? I think that the language, I mean, obviously that it's not drafted perhaps as clearly as would be required in order to avoid this ambiguity. Well, there's some resort to getting to the district court, right? Correct. Yeah. And there are, you know, in Section 11 of the Asset Purchase Agreement, there are a couple of pages of dispute resolution procedures that speak to when the parties can apply for an injunction. It has a mandatory mediation procedure. I mean, the contract envisages many ways to resolve the many disputes that could arise under a contract this complex. So when the clause says that the expert, that the determination of the accounting firm with respect to the earn-out statement can be, is final and binding and can't be entered as a judgment of the court, I don't think that we can deny that that sounds like language that suggests an arbitration. But if you go back to what the determination is, it's the determination of the earn-out statement, which is expressly computational. And because that precedes the non-circumvention provisions underneath, I think that on balance the intention of the parties was to reserve those other issues for the courts. In connection with the work that was done by the two individuals in coming up with the computation, are you challenging the math of that, or are you challenging that the numbers that were put before the two individuals were not arrived at in good faith? In effect, I'm talking about 2.6G, I guess it is. I don't think that we, with respect to the issues that we're appealing, of course the nature of the limited judicial review of an arbitration decision is that at this point, we're not even challenging whether or not Eisner Advisory Services LLC did a good job in the underlying arbitration. Well, your primary thing was there's somehow a conflict there, and because of the corporate restructuring, the Eisner Amper firm no longer exists, et cetera, but it's still the two individuals that you initially engaged, right? Those two individuals were not engaged, Judge Ambrose. Those two individuals were the engagement team and partners or employees of Eisner Amper LLP. The engagement letter that was negotiated, it's 11 pages long. It took them three months to negotiate it. But when did you object to them being involved? We never objected to those two individuals being involved. The problem is not Nelson Luis and James Agar, who were the engagement team. The problem is that Eisner Amper LLP was instructed. That's who our contract was with. And Eisner Amper LLP was a nationally recognized independent public accounting firm. But if it was Eisner Amper, it still would have been these two individuals, Luis and the other person. Is that correct? I'm sorry, I don't understand that. In other words, the initial engagement was with Eisner Amper. LLP. LLP. But the actual individuals that would have done the computation were the two individuals who, in the end, ultimately did it. Is that correct? Those two individuals remained the two individuals that were assigned to this arbitration, but now they worked for a different company. They worked for a company that did not exist at the time that we entered into the engagement letter. It is not a nationally recognized independent public accounting firm, and it is majority owned by Tower Brook Capital Partners, a private equity firm. So I think that one of the key points of error, as a matter of fact, is that Nelson Luis and James Agar are not the arbitrators. The arbitrator is the institution. But who actually did the work? Those individuals, and I assume their staff. Isn't your much better argument that this is not an arbitration? I think that's a great argument because then you don't reach the narrow scope of review under 10E4 and 10E2. But then the problem you still run into is it then has to be a computation, and they did, these individuals did a computation, and it's one that you don't like. So it would seem that the better argument there would be to go back to what you noted on appeal, which is that the numbers that were put before those individuals were not arrived at in good faith by the buyer, and therefore you have to go back to the drawing board. Isn't that correct? We don't believe that. I'm trying to help you. We don't believe that anything about the arbitration was conducted properly. Obviously we disagree with the numbers. Obviously we disagree with the assessment of the arbitrator with respect to good faith and fair dealing, non-circumvention, and whether all or substantially all the assets were divested. But I respect the authority of all of the precedent that says that the scope of judicial review is very narrow. So, yes, of course we take issue with those numbers, and part of the reason is that there was a third party, a parent company, to the defendant, Reladine, that was made expressly a party to the engagement letter solely for the purposes of providing information, discovery. And that's because the appellants believed that they had specific information that was being withheld that made it impossible to do a good faith calculation of the earner. They were made a party to the engagement letter. There were multiple requests that the arbitrator request that information from them, and ultimately the arbitrator refused to do so. We think that that is evidence of evident partiality, but also it means that ultimately the underlying numbers aren't trustworthy and the underlying analysis of whether or not the non-circumvention provisions were breached. Does that answer your question? Yeah, I mean, it would seem that the theme here is sort of like Hollywood accounting. You come up with a script and they say, okay, you'll get some residuals at the end, but the accounting says, well, we never made a profit even though somebody says we grossed $100 million. I think that's always, I mean, these are now consideration clauses are very frequently litigated, which is one of the reasons why our clients were so disturbed to find out without having been specifically notified that the arbitration, the firm that had been instructed, had divested and sold out to a private equity company. It was the first, it was a historical transaction. The first time a top 20 accountancy firm had accepted an investment from a non-CPA. That required the splitting of the two entities, and it's why on the engagement letter, which you'll see in the appendix, it says Eisner Amper LLP is the arbitrator, but the decision is issued by Eisner Advisory Services LLC. Now, Eisner Advisory Services LLC is owned by a private equity house, and that should have been specifically disclosed. Although there was, didn't you receive a couple of emails informing you about the changes in Eisner's corporate structure? So there was a, there were, there were, and it's in the record. The answer is yes, right? Yes. Okay. Now, there's no evidence in the record, and this is in the brief that my client, that my client saw that letter, and the subject was invoices, you know, staff IAS letter. That is not specifically when you've negotiated for, so the engagement letter says, all changes must be in writing, agreed by both parties. So having negotiated an 11-page engagement letter that says that any changes you have to specifically bring to the attention and agree to it in writing, I don't think that that is sufficient to waive those obligations. Do we have anything else? No. Okay. All right. Thank you, counsel. We'll get you on rebuttal. Thank you so much. Good morning, Your Honor. Good morning. May it please the Court. My name is Irving Gesluitz, and I represent the appellees, Industrial Action Services, LLC, and Relidine, LLC. I'm prepared to answer any questions the Court might have, but I think we can start. Why was the Kuhn decision not mentioned? I'm in the same boat as counsel for appellants. Let me read you maybe some of the important language. It's on page 396. It says, the contract must reflect that the parties clearly and intentionally bargain for whether and how to arbitrate. We will not enforce a contract that unclearly or ambiguously reflects the intention to arbitrate. If we apply that standard, how does your client fare here? Well, Your Honor, you also have the FAA. You have the FAA, which – Well, before we get there, does Delaware law apply here? Delaware law is the chosen law. Okay. But there's also the FAA, and the FAA – Usually what happens when you agree to have an arbitration, you have – sometimes it's in the miscellaneous provisions at the end, and here you have a miscellaneous provision, 11.17. It never mentions the word arbitration at all. And usually when you do have it, you have something like, we're going to arbitrate this by the rules of the American Arbitration Association. One side picks one arbitrator. The other side picks the other, and then the two pick a third. None of that's there. Zero. No mention of the word arbitration. How can you possibly, after Kuhn, have something that is deemed to be an arbitration when there is no mention of it at all in the asset purchase agreement? This court in Harrison v. Nissan Motor said it isn't necessary to use the word arbitration. It isn't necessary to use magic words, but you've got to use something that indicates you want to arbitrate. And I would say here, the words final and binding, and as has been mentioned before, judgment may be entered upon the award. That is arbitration. Flip it around. Judgment may be entered onto computation by the expert. And for example, you've got so many things that counsel against an arbitration that if the earn out is disputed, then there's 30 days. You can't. You don't do arbitrations in 30 days. Arbitrations take months. Your Honor, that was an aspirational provision in there as Judge Andrews. And it sounds like maybe the argument here that it's arbitration is aspirational too. Well, I would disagree, Your Honor. I would say that it isn't necessary. The cases say it isn't necessary to use the magic word arbitration. If you say final and binding and you say judgment on the award, that's arbitration. And the Harrison case, the word arbitration wasn't used. It's federal common law. Even though you're using Delaware law as the state law, this is proceeding under the Federal Arbitration Act. And you have to apply federal common law because you have to have a consistent standard. But here you have Delaware law. And Delaware law specifically says you have to be clear and unambiguous. Silence as to the word arbitration can't be clear and certainly isn't unambiguous. And you're saying, well, there are some things that one might use if this were an arbitration, like final and binding, and you can enter judgment. Those are sort of on the periphery and somehow that makes it clear and unambiguous. I would say, Your Honor, that is not the periphery. That is the language from the FAA stating that you enter judgment on a decision, whether it's expert or whether it's you're going to call it arbitration. Judgment on the award, that's taken straight from the FAA. Why did 11.17 say arbitration? Your general provision. So here you have in, what, 2.3, you have certain working capital computations that can be challenged. And then later on it says that when you go, in effect, getting your residual interest possibly, you have certain earning statements per year that can be challenged. And if so, they go to this particular, at that point, Eisner Amper. That sounds like they just, they're there to do the arithmetic. Well, Your Honor, you don't put down Ernst & Young just to do arithmetic. You don't, they, just GAAP standards is not why you would designate Ernst & Young or a similar nationally recognized arbitrator accounting firm. What you're looking for is people. Does Ernst & Young or Eisner Amper do many arbitrations? Of course. This is their industry. They do non-management advisory functions. That's why they were selected, and that's what they did. For expert determination? I'm sorry? They were selected for expert determination? No. They were selected, well, they have expertise. That's correct. But the bottom line is they were the ones to decide any issue relating to earn out. If you're saying that the company deliberately depressed revenues, that's for them to decide. They are very knowledgeable in post-M&A disputes. And, in fact, that's the reason we vetted these two individuals. They were named the engagement team in the engagement letter, which is an overlay on the original APA. But the usual arbitration, don't you, having once upon a time been an arbitrator in a prior life, people appear before you and make their arguments, even if there are no briefs. Did anybody appear before the two individuals at the Eisner firm? Oh, yeah. We had a virtual conference, sort of like a hearing, a whole day. And people testified, although not under oath. They had a whole proceeding where you were allowed to present whatever you wanted. I take issue with the argument made that they didn't allow a fair opportunity for sellers to produce whatever they want. You look at the record. You look at their decision. They certainly did. But I want to make one point here that I think is very important. Whichever way you want to come out on the issue of the realignment and on the issue of expert versus arbitrator, there's the issue of waiver. And that is crystal clear that there was a waiver here. In Goldman Sachs versus Athena Brinkman. Did you bring up the issue of waiver? Did we? In the briefs? Yes. That's the first argument. Where is it? I'm looking at the table of contents here. Yes. The first argument, I believe, it's on page three. Look at your table of contents. Is there anything in there that talks about waiver? Or forefooting or whatever. Table of contents. Freedom of life. Yeah, B1, page 30. They failed. They waived their objections to the arbitration award by failing to raise them before the arbitrators rendered the award. To be clear, what you're talking about there is a forfeiture, right? Not a waiver. A waiver is an intentional relinquishment. They just... Okay. It makes a difference. Okay. I'm saying that that word was used by this court, I believe, in the... What page are you on? Page 30. We say... This is in your red brief, right? Yes. We're on page 30? Yes. And then look at point one. Look at the heading. The district court did not clearly... Am I on the wrong... My topic, page 30, says the district court's decision. Right. And then look at B and then B1. The district court did not clearly... 31, okay. ...in finding that plaintiffs waived their objections to the arbitration award by failing to raise them before the arbitrators rendered the award. What I'm submitting to this court is you don't even have to get into whatever you want to come out on, whether this was arbitration or not, or whatever the significance of the realignment. Waiver trumps the issue. If there is waiver, this court has said in three separate cases, as long as you're minimally on notice... Waiver of what? The firm being involved or arbitration versus a computation? No, you're waiving whatever defect, whatever defect you're claiming was in the arbitration. But the point is, wasn't your point that they had notice of the parties that were going to do the deciding, even though there was a corporate restructuring? Yeah, they were on notice. In effect, they waived the parties making that decision by not objecting until it was long after they had lost. Whether you call it a forfeiture or a waiver, they waived it. Got it. It means somehow they relinquished the right. Yes, and that is three separate court of appeals cases are very strong on that. The Athena Venture case, the PNC, Weber versus PNC, and the Stone versus Bear Stearns. In every one of those cases, there's very strong language. I mean, you have to... In Athena Ventures, this is the language of the court. It's in an NPO, to be fair. That's not published, right? The Athena case is published. Weber is not, right? Weber is not. But the Athena case that Weber is based on is a published decision. Very strong language from this court that says, under the constructive knowledge standard, a party may not conduct a background investigation on an arbitrator after the award with the sole motivation to seek vacator. If there were any other way, arbitration would cease to have finality and result in endless hearings within hearings. Sellers' own affidavits make the case that they were on notice. Here, you have the affidavit of Mr. Sapp. He thought the hearing went very well. Then he got the award. He wasn't happy. He jettisoned his arbitration counsel, hired new counsel, to scour the record to see if there's some basis to overturn the award. He says it in the affidavit. That's the reason he did it. Did the individuals, when they did the computation, did they deal with the good faith issue? Absolutely, they did. They stated in the decision, and the decision is part of the record. It is a very reasoned decision that would be worthy of a court. They hit every issue that was raised in the complaint, and they address it. So this was, in fact, a waiver here. And it's by design. They admit it in the affidavit. They practically admit that there is a waiver. And if you have a waiver, that's it. It's over. And they knew about Tower Brook, too. Not only was there the e-mail from the arbitrator, but that e-mail, the counsel calls it a billing e-mail, but it says, point blank, please note that these payment instructions have changed since those issued with the last invoice. In conjunction with a recent transaction whereby non-attest services, including those that are the subject of this operating engagement letter, are going forward provided under the auspices of an Eisner amper entity named Eisner Advisory Group. This isn't just constructive notice. This is notice. And in his affidavit, counsel for the appellants who was at the arbitration proceedings acknowledges he received this e-mail. And sellers would have made their checks out to this entity. In fact, before they issued their award, they made sure they were paid. They sent out a final invoice. Who would it have been made out to? It sounds like that relates to the corporate instruction. Let's go back. It looks to me like Sam does not challenge the earn-out statement under 2.6D, which relates to errors in the preparation of the statement. Instead, I think he argues that it was intentional bad faith to circumvent the payment of the earn-out consideration under 2.6G. And G, subsection G, doesn't say anything about an accounting firm resolving disputes. But it's part of 2.6 and any dispute under the earn-out. How do we get from 2.6G to the accounting firm resolution in 2.3E? Because it states in 2.6C that any disputes over the earn-out statement goes to the dispute resolution proceeding in 2.3. So anything in 2.6 goes to 2.3. And here, for them to have made the proper computation, they would have had to look at these decisions to determine whether there was a deliberate defacement or depression of earnings designed so that they wouldn't get their earn-out. They addressed that issue in the decision. The engagement letters, I mean, the accounting firm's decision addresses that. It is a full and complete decision. Your Honor, thank you. If there are any other questions, I see my time is up. Thank you, counsel. We appreciate it. And we'll hear from both. May it please the Court. I wanted to address specifically the waiver issue because it's important for our arguments under 10A4 that the arbitrator exceeded their authority. Eisner Advisory Services LLC had no authority to issue this award or conduct the arbitration. Eisner Amper LLP was instructed. Under both the engagement letter and the asset purchase agreement, it required that the arbitration be conducted by a nationally recognized independent public accounting firm. Eisner Advisory Services, as a result of the restructuring, was not that it wasn't even incorporated at the time that we had our agreements. The contract with the parties is paramount. It's the only thing that protects the legitimacy and finality of the awards. So when they write in the agreement, it has to be a nationally recognized public independent accounting firm, and that is repeated again in the engagement letter where Eisner Amper LLP is a nationally recognized independent public accounting firm. Those words must mean something. It's what our client specifically bargained for. I think the public policy issue is also broader because, as I mentioned in the original part of my original argument, that the transaction that necessitated the corporate restructuring was material, right? It meant that Eisner Amper had to be split in two because a non-CPA can't own a public accounting firm, and those are four reasons of impartiality. So just like if I had a dispute with an oil company, if I wanted to sue Exxon Mobil, I would want to know if Chevron owned my law firm or owned the law firm that I was seeking to instruct because who owns someone means something. Having negotiated for that explicitly, they could not waive that through this e-mail, which doesn't have the word Tower Brook in it. The first two sentences of it are specifically about invoicing practice, and even where it talks about it's operating under the auspices of a new entity, Eisner Amper entity, like buries the news. It's burying the lead. These were entirely legally separate entities, and so who was instructed and who was qualified to serve as the arbitrator is not who delivered the decision letter. And so I think that speaks both to evident partiality and to exceeding their authority because the entity that issued the award wasn't who was instructed. So all of the cases on waiver have to do with disclosure at the outset. Was it information that you had notice of or could have found out at the outset but did not do the investigation? But the e-mails arguably would call for perhaps you asking additional questions if you had these concerns. I don't think so. I don't think it has sufficient red flags or is sufficiently alarming like in Athena Ventures to make us say, wait a second, why is this happening? Because they had negotiated an 11-page contract that said it couldn't be amended unless it was by both parties and signed. The Delaware Supreme Court talks about waiver, says that it's exacting, voluntary and intentional, implies knowledge of all material facts. So this is more of a forfeiture then, if anything? Yes, whether we forfeited our rights under both contracts. But, you know, the court, because their judicial review is so narrow, when we say public independent accounting firm, that's what the parties agreed to. And the party that issued the decision letter on the arbitration did not qualify. In Belko, which is cited in both of the briefs, they say the court will not hesitate to vacate an award that is not, an arbitration that is not conducted in accordance with the agreement of the parties. And so I think that this is such a case where it's so different from Freeman, right, where the facts were that both parties had contributed to Judge Lolly Green's campaign and then it seemed to be sort of manufactured. This really is powerfully suggestive of bias. And I think this is the rare instance where the finality of arbitration is best served by vacating this award and ensuring that the contract of the parties is respected. Thank you. Thank you, Counselor. Thank you. We will take this case under advisement. We want to thank Counsel for their excellent oral argument today and their briefing in this very interesting case. We'd also like to, if Counsel is amenable, to greet you at sidebar, and we'll take a short recess for that to shake hands or fist bump, depending on which direction you go in during the post-COVID period. So why don't we take a short recess, and we'll meet you at sidebar. Everybody can sit down.